**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **CLINTON W. LINDSEY,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:12-CV-4535-M-(BH)** |
| | § | |
| **JPMORGAN CHASE BANK NATIONAL** | § | |
| **ASSOCIATION,** *Successor by Merger to* | § | |
| *Chase Home Finance, LLC***, et al.,** | § | |
| **Defendants.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to the order of reference dated November 14, 2012, this case has been referred for pretrial management. Before the Court for recommendation are *Plaintiff's Motion to Remand*, filed December 7, 2012 (doc. 16), and *Defendant DHI Mortgage Company's Rule 12(b)(6) Motion to Dismiss*, filed December 31, 2012 (doc. 21). Based on the relevant filings and applicable law, Plaintiff's motion to remand should be **GRANTED** and Defendant's motion to dismiss should be **DENIED as moot.**

## I. BACKGROUND[1]

This case involves foreclosure of real property located at 1100 Sandalwood Road, Royse City, Texas 75189 (the Property). (doc. 1-3 at 4.)[2] On October 15, 2012, Clinton W. Lindsey (Plaintiff) filed suit against JP Morgan Chase Bank, N.A., successor by merger to Chase Home Finance LLC (JPMC) and DHI Mortgage Company, Ltd. (DHIM) (collectively, Defendants), in the 196th Judicial District Court of Hunt County, Texas. (*Id.* at 2.)

---

[1] The background facts come from Plaintiff's state court petition and motion to remand (docs. 1-3 and 16), as well as from the documents attached to JPMC's response to Plaintiff's motion to remand (docs. 20-1–20-3).

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

In his verified state court petition, Plaintiff alleges that he purchased the Property on October 6, 2008, with a promissory note and a deed of trust securing the note.  (*Id.* at 4.)  Both the note and deed of trust named DHIM as the "Lender."  (docs. 1-3 at 4; 20-1 at 1.)   The deed of trust named Mortgage Electronic Registration Systems (MERS), the nominee for Lender and its successors and assigns, as the beneficiary.  (docs. 1-3 at 4; 20-1 at 1.)  The deed of trust granted MERS the right to exercise any and all of the interests Plaintiff granted Lender, including but not limited to, the right to foreclose and sell the Property and to take any action required of Lender, including but not limited to, releasing and canceling the deed of trust.  (doc. 20-1 at 2.)  The deed of trust also provided that "[i]n many circumstances" upon default, "regulations issued by the Secretary" of Housing and Urban Development (HUD) would "limit Lender's rights" to accelerate the note and foreclose on the Property.  (*Id.* at 5.)

"In December 2009, Plaintiff received a letter stating [that] his escrow account was short and that he needed to pay the shortage."  (doc. 1-3 at 4.)  He immediately "contacted [JPMC] and asked that they speak with Stormy Bell," his relative, "due to [his] hectic work schedule."  (*Id.* at 4–5.)  Because Plaintiff could not afford the increased payments needed to cover the shortage, a JPMC "customer service representative" informed his relative that JPMC "had a program that would help lower [his] monthly payments" and instructed her "to go online ... and download the 'request for modification' paperwork and to fax it to [JPMC]."  (*Id.* at 5.)  "Plaintiff complied and faxed the [requested] paperwork."  (*Id.*)  After three weeks went by without a response, Plaintiff's relative called JPMC numerous times and was "told each time to be patient."  (*Id.*)

On February 2, 2010, JPMC informed Plaintiff that he "did qualify for the loan modification program and that additional paperwork was needed."  (*Id.*)  Plaintiff completed and faxed the

required documents to JPMC. (*Id.*) He "was told that it could take up to three months to review" his application "and another month [for his application] to be assigned to a customer specialist." (*Id.*) "In the meantime," he made "three trial payments of approximately $1,700.00 a month." (*Id.*)

Three months later, Plaintiff's "account was still under review," and he was not allowed to make any more payments until his application was approved and an "agreement" was set in place. (*Id.* at 5–6.) At that point, a JPMC employee directed him to "update the paperwork with current bank statements" and explained that it could take three more months to review his updated application. (*Id.* at 6.) After several failed attempts to contact their assigned representative, Plaintiff's relative spoke with a JPMC employee who erroneously told her that Plaintiff "had opted out of the modification process." (*Id.*) The representative "told [her] once again that [Plaintiff] qualified for the modification program and to re-fax all the paperwork" and "be patient." (*Id.*)

On May 14, 2010, MERS "assigned the note and deed of trust to [JPMC]." (*Id.* at 4.) The assignment document identified MERS as the assignor and specified that MERS was acting as the "nominee for Lender and Lender's successors and assigns." (doc. 20-2 at 2.) The assignment was filed with the Hunt County Clerk. (*See id.* at 1.) Plaintiff alleges that because MERS "never held the ... note" and "was never transferred the note nor was ... entitled to receive payments" under it, the assignment transferred only the deed of trust "and not the note." (docs. 1-3 at 4; 16 at 4.)

In July 2010, "Plaintiff attempted to make" a $5,000.00 payment toward his account but JPMC did not accept the payment. (*Id.* at 7.) Plaintiff's relative was later "informed that the Property was up for foreclosure." (*Id.*) She "was [also] told that someone had called and opted [Plaintiff] out of the program." (*Id.*) They asked her "to fax all the paperwork again" so that "the foreclosure would be dismissed." (*Id.*)

"In early September 2010," Plaintiff's relative contacted JPMC "and was informed that some of the paperwork was missing and that every single form that she had already faxed needed to be sent again." (*Id.*) Their assigned representative told her that everything "could ... be avoided if Plaintiff would pay his bills." (*Id.*) When his relative requested that another representative be assigned to their account, she was instructed "yet again, to re-fax all the paperwork with a current date even though it had not been 60 days since the last paperwork was sent in." (*Id.*)

As of January 2011, "there was still no resolution" of Plaintiff's loan modification application. (*Id.* at 8.) On February 27, 2012, his relative called the JPMC customer service line "to get an update" but they told her to contact their assigned specialist. (*Id.*) She called the specialist, but the specialist never returned her phone call. (*Id.*) Another JPMC employee informed her that the Property "was up for a foreclosure sale the following Tuesday, March 6th," 2012. (*Id.*) JPMC purportedly mailed Plaintiff a notice of foreclosure but he did not receive it. (*Id.*) The specialist also told her that "the foreclosure could [still] be postponed since Plaintiff qualified for a loan modification," but that only their assigned representative "could stop the foreclosure." (*Id.*) Plaintiff would also need to pay $21,000.00 to avoid the foreclosure. (*Id.*) His relative told the representative "that Plaintiff had enough money in the bank and it could be verified." (*Id.*)

When Plaintiff's relative unsuccessfully tried to contact their assigned specialist, another JPMC employee took her call and "said that Plaintiff was not in the modification program" because he "had not done anything to help with the modification process," and that "it was too late and ... [JPMC] would be proceeding with [the] foreclosure." (*Id.*) His relative "contacted the foreclosure department again and explained [their] situation." (*Id.* at 9.) Another JPMC employee emailed their assigned specialist on her behalf, but the specialist never contacted them. (*Id.*)

By March 5, 2012, "Plaintiff had no choice but to file for bankruptcy to stop the foreclosure." (*Id.*) Two weeks later, JPMC "sent Plaintiff a letter stating that if his home did not sell" at the foreclosure sale, "they would like to offer help." (*Id.*) Because he was reassured that JPMC "would like to help him with a modification," "Plaintiff canceled the bankruptcy immediately in hopes of avoiding the bankruptcy process." (*Id.*) JPMC requested additional documentation "and told Plaintiff to start fresh." (*Id.*) Plaintiff submitted all the requested documents and attempted to make another payment but JPMC "would not accept any ... payments." (*Id.*)

"On May 24, 2012, Plaintiff received a letter from [JPMC's] attorneys [stating] that the Property was again scheduled for foreclosure ... on Tuesday, July 3, 2012." (*Id.*) When his relative called JPMC, she was told "once again ... to send in more paperwork." (*Id.*) Between June 2, 2012 and August 29, 2012, his account was assigned to at least three different specialists, and each one requested additional documentation. (*See id.* at 9–11.) His relative "attempted to phone" one of the representatives "for an entire week, leaving two voicemails a day," but he "never returned any calls." (*Id.* at 10.) By late August, "Plaintiff was tired of the endless loan modification cycle and wanted to do a short sale." (*Id.*) On August 29, 2012, he faxed the "22 pages" of information that JPMC requested "but the short sale department said the paperwork was never [received]." (*Id.* at 11.)

Plaintiff's relative submitted "the paperwork again." (*Id.*) When she called to "check on the status of the short sale and to get receipt of the paperwork," a representative from the foreclosure department told her that only a $44,000.00 payment "would stop the foreclosure sale." (*Id.*) "Once Plaintiff had [that] amount," his relative called "the foreclosure department and instead they said that $67,000.00 would stop the sale." (*Id.*) Because he could not afford to pay that amount, he

"requested permission to continue with the short sale and avoid foreclosure." (*Id.*)

Their assigned representative from the short sale department "would never answer the phone nor return any of Plaintiff's or [his relative's] phone calls." (*Id.*) They later learned that the representative "should never have been assigned to the account because he was in the wrong department and that [was] why he was not returning any phone calls." (*Id.*) They were also informed that "the short sale agreement was never set up in the system and ... the [Property] was scheduled for foreclosure on September 4, 2012." (*Id.*)

On September 4, 2012, JPMC sold and purchased the Property at a non-judicial foreclosure sale. (docs. 1-3 at 12; 20-3 at 1.) Subsequently, "Defendants ... tr[ied] to evict Plaintiff from the Property." (doc. 1-3 at 12.)

Plaintiff maintains that "Defendants' conduct of deliberately, or negligently, delaying and misleading [him] to the point of foreclosure [was] unconscionable." (*Id.*) He claims that during the time that his modification application was pending, "Defendants added additional charges to [his] account" and therefore "waived their right to accelerate and foreclose." (*Id.*) "Defendants, through various agents and representatives," made numerous misrepresentations "concerning the amounts allegedly owed on [his] mortgage." (*Id.*) These misrepresentations "were made recklessly, and with total disregard for the[ir] truth or validity." (*Id.* at 13.) Accordingly, "the demands made in connection" with these false statements, the acceleration of his note, and the foreclosure of the Property "were made unlawfully." (*Id.*)

Plaintiff asserts claims for breach of contract and anticipatory breach of contract, unreasonable collection efforts, violations of the Texas Deceptive Trade Practices Act (DTPA) and the Texas Debt Collection Practices Act (TDCPA), negligent misrepresentation, suit to quiet title,

and trespass to try title.  (*Id.* at 13–28.)  He seeks actual and punitive damages, declaratory judgment, injunctive relief, "reasonable and necessary attorney's fees," and costs of suit.  (*Id.* at 26, 28–30.)

On November 9, 2012, JPMC removed the action asserting federal question jurisdiction under 28 U.S.C. § 1331 and diversity jurisdiction under 28 U.S.C. § 1332.  (doc. 1 at 3–5.)  On October 15, 2012, Plaintiff moved to remand the case to the state court pursuant to 28 U.S.C. § 1447(c) for lack of subject-matter jurisdiction.  (doc. 16.)  The motions are now ripe.

## II.  REMOVAL

Any civil action brought in state court may be removed to federal court if the district court has original jurisdiction over that action.  28 U.S.C. § 1441(a).  A district court's original jurisdiction is of two types: federal question jurisdiction and diversity jurisdiction.  28 U.S.C. §§ 1331, 1332.  Federal question jurisdiction exists in all civil actions arising under the Constitution, laws, or treaties of the United States.  *Id.* § 1331.  Diversity jurisdiction exists in all civil actions where the amount in controversy exceeds $75,000.00, exclusive of interests and costs, and there is diversity of citizenship between the parties.  *Id.* § 1332(a).

To determine whether it has federal jurisdiction over the removed case, the court must "consider the claims in the state court petition as they existed at the time of removal."  *Manguno v. Prudential Prop. and Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002) (citing *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 264 (5th Cir. 1995)).  "The removing party bears the burden of showing that federal jurisdiction exists and that removal was proper."  *Id.*  "[A]ny doubt about the propriety of removal,  must be resolved in favor of remand."  *Gasch v. Hartford Acc. & Indem. Co.*, 491 F.3d 278, 281–82 (5th Cir. 2007).

"[W]hen a court performs its duty to verify that it has jurisdiction, it may be required to survey the entire record, including the defendant's pleadings, and base its ruling on the complaint, on undisputed facts, and on its resolution of disputed facts."  *Aquafaith Shipping, Ltd. v. Jarillas*, 963 F.2d 806, 808 (5th Cir. 1992) (citation omitted); *see also Smith v. Estate of Wagner*, No. CIV A H 06-02629, 2006 WL 2729282, at *3 (S.D. Tex. Sept. 25, 2006) (explaining that a "court ... [may] consider the defendant's notice of removal, other pleadings, and the record as of the time of removal if necessary to shed light on the plaintiff's pleadings").  "The purpose of this careful survey, however, is to shed light on the plaintiff's pleadings.  The court's focus is on the plaintiff's pleadings, not the defendant's."  *Aquafaith*, 963 F.2d at 808.

### III.  FEDERAL QUESTION JURISDICTION

Plaintiff argues that his breach of contract claim does not establish federal question jurisdiction because it implicates his "rights under state law," does "not turn on a construction of HUD ... regulations," and "can be resolved independently from federal law."  (doc. 16 at 3.)  His claim is premised on Defendants' alleged: (1) breach of the note and deed of trust, (2) violations of certain HUD regulations[3] (3) violations of Tex. Prop. Code § 51.002, (4) breach of "a unilateral contract," and (5) breach of the duty of good faith and fair dealing.  (*See* doc. 1-3 at 13–17.)  JPMC responds that Plaintiff's breach of contract claim establishes federal question jurisdiction because the "interpretation of ... federal right[s]," i.e., the protections afforded by the HUD regulations, is "necessary" to its resolution.  (doc. 20 at 9.)

Federal question jurisdiction exists when a federal question is presented on the face of the

---

[3]   Although Plaintiff also asserts that some of the regulations allegedly violated were "FHA" regulations, all the regulations that he identifies in the Code of Federal Regulations (C.F.R.) are promulgated and enforced by HUD. *See* 24 C.F.R. § 203.604.  Accordingly, this aspect of this claim is analyzed solely under the HUD regulations.

plaintiff's well-pleaded complaint. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004); *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987). A complaint presents a federal question on its face when it "establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Singh v. Duan Morris LLP*, 538 F.3d 334, 338 (5th Cir. 2008). The Supreme Court and the Fifth Circuit have consistently noted "the long-settled understanding that the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Singh*, 538 F.3d 334 at 338 (citing *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 813 (1986)). Even the "fact that a substantial federal question is necessary to the resolution of a state-law claim is not sufficient to permit federal jurisdiction." *Id.* (citation omitted). A federal issue embedded in a state claim establishes federal jurisdiction only when: "(1) resolving [the] federal issue is necessary to resolution of the state-law claim; (2) the federal issue is actually disputed; (3) the federal issue is substantial; and (4) federal jurisdiction will not disturb the balance of federal and state judicial responsibilities." *Id.* at 338. All four factors must be met. *See id.*

A.      **Resolution of a "Necessary" Federal Issue**

As to the first factor, "[w]hen a claim can be supported by alternative and independent theories of recovery, one based on state law and the other on federal law, that claim may not form the basis for federal question jurisdiction because federal law is not a 'necessary' element of the claim." *Goffney v. Bank of Am., N.A.*, No. CIV.A. H-12-1868, 2012 WL 4127952, at *4 (S.D. Tex. Sept. 17, 2012) (citing *Willy v. Coastal Corp.*, 855 F.2d 1160, 1170–71 (5th Cir. 1988)); *see also Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 811 (1988).

Here, in addition to Defendants' alleged violation of HUD regulations, Plaintiff premises his

breach of contract claim on their alleged: (1) breach of the note and deed of trust, (2) violations of

Tex. Prop. Code § 51.002, (3) breach of a unilateral contract, and (4) breach of the duty of good faith

and fair dealing.  (*See* docs. 1-3 at 13–17; 16 at 4.)  The issue of whether Defendants violated the

HUD regulations is therefore not a "a necessary element" of Plaintiff's breach of contract claim in

this case because he asserts "alternative and independent" theories to support it.  *See Henry v. Bank*

*of Am., N.A.*, No. 4:12-CV-786-A, 2012 WL 6730718, at *4 (N.D. Tex. Dec. 28, 2012) (holding that

the defendant's alleged violations of HUD regulations were not a necessary element of the plaintiffs'

breach of contract claim because the claim was also based on "violations of Texas law[] and

violations of the note and deed of trust itself"); *Goffney*, 2012 WL 4127952, at *4 (holding that the

defendant's alleged violations of federal lending guidelines were "not necessary to the overall

success" of the plaintiff's breach of contract claim because she "alleged at least one [other] theory

… that [did] not require any interpretation of federal law"); *compare  Leggette v. Washington Mut.*

*Bank, FA*, No. 3:03-CV-2909-D, 2005 WL 2679699, at *2-3 (N.D. Tex. Oct. 19, 2005) (Fitzwater,

C.J.) (holding that the plaintiff's breach of contract claim "necessarily raise[d] a ... federal issue"

because "[e]ach ground" of her claim "necessarily turn[ed] on [the defendant's] obligations under"

the HUD regulations at issue).

## B.      Whether the Federal Issue is Substantial

Assuming for purposes of this motion that the first and second *Singh* factors have been met,[4]

"federal jurisdiction demands not only a contested federal issue, but a substantial one, indicating a

serious federal interest in claiming the advantages thought to be inherent in a federal forum."  *Singh*,

---

[4]The second factor is not specifically addressed because JPMC does not appear to dispute Plaintiff's allegations that Defendants violated certain HUD regulations.  It contends that Plaintiff's "allegations regarding HUD violations are the only counts of [his] breach-of-contract claim that are not facially implausible."  (*See* docs. 1; 20 at 9.)

538 F.3d at 338–39 (citing *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313 (2005)); *Alomang v. Freeport-McMoran Inc.*, No. CIV. A. 96-2139, 1996 WL 601431, at *6 (E.D. La. Oct. 17, 1996) (citation omitted).   In determining whether the federal issue is substantial, the court must consider the "nature of the federal interest at stake." *Grable*, 545 U.S. at 317 (citation omitted); *Merrell Dow*, 478 U.S. at 814 n. 12.   Where Congress has not provided a "private federal remedy for violations of [a federal] statute," the fact that a violation of the statute is an element of the state claim is insufficient to establish a substantial federal interest.  *See Merrell Dow*, 478 U.S. at 814; *Singh*, 538 F.3d at 336.   In *Singh*, the Fifth Circuit found that federal trademark law—the federal law embedded in the plaintiff's legal malpractice claim—"not only provide[d] no [private] remedy for aggrieved clients to recover against negligent trademark attorneys[,] but also ha[d] an object entirely different from that of state malpractice law." *Singh*, 538 F.3d at 339.   The Court also found that by its nature, the federal interest at stake did not "require[] [the] resolution of an important question of [federal] law," but was instead "predominantly one of fact," i.e., whether the defendant-attorney failed to introduce "available evidence that would have successfully established secondary meaning" of the plaintiff's trademark. *Singh*, 538 F.3d at 339. The Court therefore held that the federal issue  was not substantial.  *Id.*

     With respect to the National Housing Act (NHA), 12 U.S.C. §§ 1701–1750, and the corresponding HUD regulations, courts in this Circuit have found that their objective is not to provide mortgagors with a private remedy for a mortgagee's "failure to follow," but that they "deal only with the relations between the mortgagee and the [federal] government." *Leggette*, 2005 WL 2679699, at *3 (quoting *Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 360 (5th Cir. 1977)); *see also Moses v. Banco Mortgage Co.*, 778 F.2d 267, 271–72 (5th Cir. 1985) (holding that "neither the

Federal Housing Act nor the HUD regulation [at issue] was intended directly to benefit" private plaintiffs). Consequently, courts have focused on the nature of the parties' dispute to determine whether the alleged violations of federal regulations presents a substantial federal issue. In *Leggette*, the court held that the federal issue was substantial because the "dispute" between the parties "rest[ed] entirely on the correct interpretation of three federal regulations[,] … and not upon questions of fact, such as whether" the defendant actually violated those regulations. *Leggette*, 2005 WL 2679699, at *3. By contrast, in *Goffney*, the court held that the federal issue was not substantial because the parties' dispute required a "fact-bound and situation-specific" inquiry and did not turn on the correct interpretation of the federal lending guidelines. *Goffney*, 2012 WL 4127952, at *5.

Here, the parties' dispute does not rest on the correct interpretation of federal law; it requires only a factual determination of whether Defendants violated the HUD regulations that Plaintiff includes in his breach of contract claim. (*See* docs. 1-3 at 13–16; 20 at 9.) Accordingly, the federal issue in this case is not substantial, and Defendants have not met the third factor. *See Singh*, 538 F.3d at 339; *Goffney*, 2012 WL 4127952, at *5.

C.   **The Balance of Federal and State Judicial Responsibilities**

Finally, JPMC has also not met the fourth *Singh* factor; it does not even address it. "Because federal 'jurisdiction to hear a state-law claim always raises the possibility of upsetting the state-federal line drawn (or at least assumed) by Congress, ... there must always be an assessment of any disruptive portent in exercising federal jurisdiction.'" *Singh*, 538 F.3d at 339 (citing *Grable*, 545 U.S. at 314) (parenthesis in *Grable*).

In *Leggette*, the court recognized that foreclosure has been "a traditional creditor's remedy under state law" and "[r]egulating … foreclosure [procedures] … has traditionally been the province

of states, despite federal regulation of some sectors of the lending industry." *Leggette*, 2005 WL 2679699, at *3 (citing *Roberts*, 556 F.2d at 359). Although it found that the plaintiff's breach of contract claim presented a substantial federal issue in that case, the court held that it lacked subject-matter jurisdiction over it because "[e]xercising federal jurisdiction over home foreclosure disputes typically governed by private contract and state law [would] portend[] a significant transfer of judicial responsibilities from state to federal courts." *Id.* at *4. The court in *Goffney* agreed with *Leggette*'s reasoning and also noted that the absence of a "private right of action" under the HUD regulations "indicate[d] that Congress did not intend to alter the balance of federal and state judicial responsibilities in mortgage foreclosure litigation." *Goffney*, 2012 WL 4127952, at *5 (citing to *Grable*, 545 U.S. at 318). Other courts in this district have reached similar conclusions. *See, e.g.*, *Henry*, 2012 WL 6730718, at *6; *Buis v. Wells Fargo Bank, N.A.*, 401 F. Supp. 2d 612, 617–18 (N.D. Tex. 2005).

Here, JPMC has not provided any reasons for distinguishing these well-reasoned cases, which support a finding that exercising federal jurisdiction over Plaintiff's breach of contract claim arising from the foreclosure of his home will not disturb the balance of federal and state judicial responsibilities. JPMC has not shown that Plaintiff's breach of contract claim presents a federally-created cause of action or that his right to relief necessarily depends on the resolution of a substantial question of federal law.

JPMC has not met its burden to show federal question jurisdiction in this case.

## IV. DIVERSITY JURISDICTION

Because no federal question is presented in this case, removal was proper only if JPMC has met its burden of showing that there is diversity of citizenship between the parties. *See Cantor v.*

-13-

*Wachovia Mortg., FSB*, 641 F. Supp. 2d 602, 605 (N.D. Tex. 2009); *see also Merryman v. JPMorgan Chase & Co.*, No. 3:12-CV-2156-M BH, 2012 WL 5409735, at *2 (N.D. Tex. Oct. 12, 2012), *recommendation adopted*, 2012 WL 5409749 (N.D. Tex. Nov. 5, 2012).

## A.     Diversity of Citizenship

Plaintiff contends that diversity is not complete because both he and DHIM are Texas citizens.  (doc. 16 at 4.)

An action removable based on diversity jurisdiction may not be removed if "any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."  28 U.S.C. § 1441(b).  A case that is removed under § 1332 must have "complete diversity" of citizenship.  *Lincoln Property Co. v. Roche*, 546 U.S. 81, 84 (2005); *see also* 28 U.S.C. § 1332.  The party asserting diversity jurisdiction must "distinctly and affirmatively" allege the citizenship of all the parties.  *Getty Oil Corp. v. Ins. Co. of N. Am.*, 841 F.2d 1254, 1259 (5th Cir. 1988); *McGovern v. Am. Airlines, Inc.*, 511 F.2d 653, 654 (5th Cir. 1975) (per curiam) (citations omitted).

While JPMC alleges that it is "a citizen of Ohio" and that Plaintiff is "an individual resident citizen of the State of Texas," it does not specify DHIM's citizenship.  (doc. 1 at 4–5.)  In his petition, Plaintiff essentially alleges that DHIM is a Texas citizen because it "is a Texas domestic limited partnership."  (doc. 1-3 at 3.)  "The citizenship of a limited partnership is based upon the citizenship of each of its partners."  *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1079 (5th Cir. 2008) (citing *Carden v. Arkoma Assocs.*, 494 U.S. 185, 195–96 (1990)).  Specifically, these entities are considered citizens of every state of which their partners are citizens.  *Id.*  Because JPMC has not identified the citizenship of DHIM's partners, it has failed to "distinctly and affirmatively"

-14-

allege DHIM's citizenship.  This failure alone is sufficient to warrant remand.  *See McGovern*, 511 F.2d at 654 (affirming dismissal of a complaint for lack of subject-matter jurisdiction where the plaintiff made "deficient allegations of diversity"); *see also Gasch*, 491 F.3d at 281–82 (doubts about the propriety of removal must be resolved in favor of remand).

**B.**     **Improper Joinder Exception**

    JPMC argues that DHIM's citizenship should be disregarded in determining diversity of citizenship because it was improperly joined, as "Plaintiff is unable to establish a cause of action" against it.  (doc. 1 at 5.)  It contends that "establishing a claim against [DHIM] is entirely dependent on Plaintiff proving that [DHIM] can be held accountable for MERS's and JPMC's alleged conduct", and he "has alleged no such theory and cannot in good faith allege such a theory."  (doc. 20 at 2.)

    The improper joinder doctrine is a narrow exception to the complete diversity rule.  *Cuevas v. BAC Home Loans Servicing, LP*, 648 F.3d 242, 249 (5th Cir. 2011).  The doctrine ensures "that the presence of an improperly joined, non-diverse defendant does not defeat federal removal jurisdiction premised on diversity."  *Borden v. Allstate Ins. Co.*, 589 F.3d 168, 171 (5th Cir. 2009) (citation omitted).  It allows a court to disregard the citizenship of an improperly joined defendant in determining diversity.  *See Smallwood v. Illinois Cent. R.R. Co.*, 385 F.3d 568, 572 (5th Cir. 2004) (en banc).  To show improper joinder, the removing defendant bears the heavy burden of showing either: "(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court."  *Id.*  at 573–74 (citing *Travis v. Irby*, 326 F.3d 644, 646–47 (5th Cir. 2003)).

    "The starting point for analyzing claims of improper joinder must be the statutes authorizing

removal to federal court of cases filed in state court." *Id.* at 572; *Merryman*, 2012 WL 5409735, at *2. A removing defendant must demonstrate that there is "no reasonable basis" for predicting that the plaintiff might be able to recover against that defendant. *Id*. at 573. There are two means for predicting whether the plaintiff has a reasonable basis for recovery. *Id.*

Initially, a "court may conduct a Rule 12(b)(6)-type analysis, looking initially at the allegations of the complaint to determine whether the complaint states a claim under state law against the in-state defendant." *Id.* (citation omitted). It must take as true the plaintiff's well-pleaded allegations of fact and resolve any contested issues of fact or ambiguities in state law in his favor. *Cantor*, 641 F. Supp. at 608 (citations omitted). The court does not predict "whether the plaintiff will certainly or even probably prevail on the merits, but look[s] only for a possibility that he may do so." *Dodson v. Spiliada Mar. Corp.*, 951 F.2d 40, 42 (5th Cir. 1992) (citation omitted). "Ordinarily, if a plaintiff can survive a Rule 12(b)(6) challenge, there is no improper joinder." *Smallwood*, 385 F.3d at 573. If "a plaintiff has stated a claim, but has misstated or omitted discrete facts that would determine the propriety of joinder . . . the district court may, in its discretion, pierce the pleadings and conduct a summary inquiry." *Id.* Although a matter for the court's discretion, "a summary inquiry is appropriate only to identify the presence of discrete and undisputed facts that would preclude [the] plaintiff's recovery against the in-state defendant." *Id.* at 573–74. The court may not move "beyond jurisdiction and into a resolution of the merits." *Id.* at 574.

In his state court petition, Plaintiff asserts claims against Defendants for breach of contract and anticipatory breach of contract, unreasonable collection efforts, violations of the DTPA and the TDCPA, negligent misrepresentation, suit to quiet title, and trespass to try title. (doc. 1-3 at 13–28.) In his motion to remand, he essentially concedes that only his claims for violations of the TDCPA

and breach of contract implicate DHIM.  (*See* doc. 16 at 4–5.)

1.    *Texas Debt Collection Practices Act*

Plaintiff alleges that Defendants' "acts, omissions, and conduct" constituted violations of §§ 392.304(19), 392.304(a)(8), 392.303(a)(2), and 392.301(a)(8) of the TDCPA.  (doc. 1-3 at 23–24.)  JPMC contends that there is no reasonable basis to predict that he can recover from DHIM under the TDCPA because he asserts no facts showing that DHIM was a debt collector under the Act.  (doc. 20 at 6.)  It argues that Plaintiff has "not alleged a vicarious-liability theory under which [DHIM] could be held responsible for JPMC's ostensible foreclosure."  (*Id.*)

a.    Debt Collection

"The TDCPA prohibits debt collectors from using various forms of threatening, coercive, harassing or abusive conduct to collect debts from consumers."  *Merryman*, 2012 WL 5409735, at *4.  The Act defines "debt collector," in relevant part, as "a person who directly or indirectly engages in debt collection."  Tex. Fin. Code Ann. § 392.001(6) (West 2006).  "Debt collection" is defined as "an action, conduct, or practice in collecting, or in soliciting for collection, consumer debts that are due or alleged to be due a creditor."  *Id.* § 392.001(5).  Debt collection can include "actions taken in foreclosing real property."  *Sanghera v. Wells Fargo Bank*, *N.A.*, No. 3:10-CV-2414-B, 2012 WL 555155, at *7 (N.D. Tex. Feb. 21, 2012) (citation omitted); *see also Puente v. CitiMortgage, Inc*., No. 3:11-CV-2509-N, 2012 WL 4335997, at *6 (N.D. Tex. Aug. 29, 2012) ("attempted or actual foreclosure can violate [the] [T]DCPA").

Here, Plaintiff fails to allege any facts showing that DHIM was a debt collector within the meaning of the TDCPA.  Although any attempt to foreclose on the Property by DHIM could fall within the purview of the TDCPA, *Sanghera*, 2012 WL 555155, at *7, Plaintiff does not allege or

state any facts showing that DHIM was involved in the foreclosure process.  The substitute trustee's deed attached to JPMC's response to Plaintiff's motion to remand shows that JPMC sold and bought the Property at the foreclosure sale.  (*See* doc. 20-3 at 1.)  Moreover, while Plaintiff claims that he received a notice that his escrow account was under-funded five months before MERS assigned his mortgage to JPMC, he does not allege or state any facts showing that DHIM collected or attempted to collect on his account before it was transferred to JPMC.  Accordingly, there is no reasonable basis to predict he that might recover against DHIM under the TDCPA on this basis.

   b.  Subsection 392.303(a)(2): Collection of Unauthorized Charges

  During debt collection, § 392.303(a)(2) of the TDCPA prohibits a debt collector from using "unfair or unconscionable means that employ" "collecting or attempting to collect interest or a charge, fee, or expense incidental to the obligation unless the interest, or incidental charge, fee, or expense is expressly authorized by the agreement creating the obligation or legally chargeable to the consumer."  Tex. Fin. Code Ann. § 392.303(a)(2) (West 2005).

  Plaintiff claims that while his loan modification application was pending, Defendants "imposed" on his account "wrongful charges" such as "penalties, attorney['s] fees, [and] corporate charges," unauthorized "late fees," and "past due interest for nonpayment." (doc. 1-3 at 24.)  These allegations fail to raise a reasonable inference that DHIM collected or attempted to collect any unauthorized interest, charges, fees, or expenses from him.  Between the day he received notice of his escrow account shortage and the date of the foreclosure sale, he made payments or offered to make payments only to JPMC.  (*See* doc. 1-3 at 4–13.)  Accordingly, there is no reasonable basis for predicting that he might recover against DHIM under § 392.303(a)(2).

      c.        <u>Subsections 392.304(a)(8) and 392.304(a)(19): Misrepresentation</u>

In debt collection, or in obtaining information concerning a consumer, § 392.304(a)(8) prohibits a debt collector from "misrepresenting the character, extent, or amount of a consumer debt." Tex. Fin. Code Ann. § 392.304(a) (8) (West 2004). Subsection 392.304(a)(19) "operates effectively as a 'catch-all' provision, prohibiting a debt collector from 'using any other false representation or deceptive means to collect a debt or obtain information concerning a consumer.'" *Sanghera*, 2012 WL 555155, at *8 (citing § 392.304(a)(19)). A misrepresentation for purposes of § 392.304(a)(19) is "a false or misleading assertion." *Id.* at *9.

Plaintiff alleges that "[t]hrough [their] communications and demands, Defendants misrepresented the character and extent of [his] mortgage." (doc. 1-3 at 24.) They falsely told him that "he qualified for a loan modification and worked out a three month trial payment agreement." (*Id.*). They requested "the same documents over and over again with no resolve or progress [of his] application, until finally [JPMC] foreclosed on the property." (*Id.*) These allegations do not raise a reasonable inference that DHIM misrepresented the character, extent, or amount of his mortgage in violation of §392.304(8), or that it made a "false" or "misleading" assertion in violation of § 392.304(19), because Plaintiff and his relative communicated only with JPMC's employees throughout the period at issue. (*See* doc. 3 at 4–13.) Accordingly, there is no reasonable basis to predict that he might recover against DHIM under §§ 392.304(a)(8) or 392.304(a)(19).

      d.        <u>Subsection 392.301(a)(8): Threat to Take an Unlawful Action</u>

Subsection 392.301(a)(8) provides: "In debt collection, a debt collector may not use threats, coercion, or attempts to coerce that employ ... threatening to take an action prohibited by law." Tex. Fin. Code Ann. § 392.301(a)(8) (West 2006).

In his complaint, Plaintiff entirely fails to allege that Defendants threatened to take any action prohibited by law. (*See* doc. 1-3 at 23–25.) In his motion to remand, he asserts that DHIM could not foreclose on the Property because "MERS did not own or hold the note, and thus was incapable of transferring it to [JPMC]" and that DHIM "violated § 392.301(a)(8)" "by attempting to foreclose when the law prohibit[ed]" it from doing so. (doc. 16 at 4–5.) These allegations could not plausibly entitle him to relief against DHIM because, as discussed more fully below in the section relating to his breach of contract claim, MERS had authority to assign the note to JPMC. Ultimately, he fails to allege any facts showing that DHIM was involved in the foreclosure or that it even "threatened" to foreclose on the Property. (*See* doc. 1-3.) There is also no reasonable basis for predicting that he might recover against DHIM under § 392.301(a)(8) of the TDCPA.

### 2.     *Breach of Contract*

Plaintiff asserts a breach of contract claim against Defendants. (*See* docs. 1-3 at 13–17; 16 at 4.) JPMC argues, in essence, that he cannot state a valid breach of contract claim against DHIM because MERS's assignment to JPMC terminated his contract with DHIM before the events giving rise to this claim occurred.[7] (doc. 20 at 2–3.)

In Texas, the essential elements of a breach of contract claim are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith v. JPMorgan Chase Bank, N.A.*, No. 12-40816, 2013 WL 1165218, at *1 (5th Cir. Mar. 22, 2013) (citing *Mullins v. TestAmerica, Inc.,* 564 F.3d 386, 418 (5th Cir. 2009)).

#### a.     Existence of a Valid Contract Between Plaintiff and DHIM

---

[7] Similarly, in its motion to dismiss, DHIM alleges that Plaintiff fails to state a breach of contract claim against it because "[a]s a result of the assignment, DHIM [was] no longer a party to the contract." (doc. 21 at 6.)

Plaintiff alleges that on October 6, 2008, he entered into a lending contract with DHIM by signing a promissory note in favor of DHIM and a deed of trust naming MERS as the beneficiary, "solely as nominee for [DHIM]." (doc. 1-3 at 4, 14.) He claims that because MERS was "not the payee" or holder of the note, its assignment of the note and deed of trust to JPMC in May 2010 "was only effective as to the deed of trust." (doc. 23 at 2.) Accordingly, DHIM was still the owner and holder of the note, and was therefore still a party to the contract, at the time that the events giving rise to his breach of contract claim took place. (*See* docs. 1-3 at 4, 18; 23 at 2.)

Courts in Texas have held that "a party cannot escape its obligations under a contract merely by assigning the contract to a third party." *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 346–47 (Tex. 2006) (citations omitted); *Potts v. Burkett*, 278 S.W. 471, 473 (Tex. Civ. App.—Fort Worth 1926, no writ) ("[T]he assignor of a contract remains liable for the performance of the obligations which he assumed therein, even after [the contract] is assigned."). The assignor "remains liable unless expressly or impliedly released by the other party to the contract." *Seagull Energy*, 207 S.W.3d at 347; *accord Ingalls Iron Works Co. v. Fruehauf Corp.*, 518 F.2d 966, 969 (5th Cir. 1975) ("Mere assignment of the obligation from one [party] to another even with the [obligor's] knowledge of that assignment will not suffice to release the original [party] unless there is the crucial intent to substitute."); *W. Oil Sales Corp. v. Bliss & Wetherbee*, 299 S.W. 637, 638 (Tex. Comm'n App. 1927, judgm't adopted) (to same effect) (citation omitted).

Here, JPMC does not allege that Plaintiff knew of MERS's assignment of his mortgage to JPMC, much less that Plaintiff released DHIM from its obligations under the deed of trust. The copy of the recorded assignment attached to JPMC's response to Plaintiff's motion to remand states only that "for value received[,] [the] Holder of the Note and Deed of Trust does [t]hereby evidence

and memorialize its transfer and assignment of the Note and Deed of Trust to [the] Assignee." (*See*

doc. 20-2 at 3.) It does not reflect any agreement by Plaintiff to terminate his contract with DHIM

and that JPMC "substitute" DHIM under the deed of trust. Accordingly, Plaintiff has stated enough

facts to raise a reasonable inference that he had a valid contract with DHIM at the time that the

events giving rise to his breach of contract claim occurred.

> b.   DHIM's Breach

Only three grounds of Plaintiff's breach of contract claim implicate DHIM: (1) his

contention that DHIM breached the deed of trust via MERS's assignment of his mortgage to JPMC,

(2) the alleged violations of Tex. Prop. Code § 51.002, and (3) the alleged violations of certain HUD

regulations.[8] (*See* docs. 1-3 at 13–17; 16 at 4.)

> i.   *DHIM's Breach of the Deed of Trust via MERS's Assignment*

Plaintiff contends that "the language in the assignment of the deed of trust purporting to

transfer the promissory note [was] ineffective" because MERS was "not the payee of" and "never

held the promissory note." (doc. 1-3 at 4, 17.) Accordingly, DHIM, "the original lender," breached

the deed of trust when MERS assigned the note to JPMC. (doc. 16 at 4.)

Courts in this Circuit have held that where MERS has the right to foreclose under the deed

of trust, it also has the authority to transfer that right by assigning the deed of trust. *See Willeford*

---

[8] Plaintiff argues that a "unilateral contract" was created and breached when JPMC misrepresented the amount that he needed to pay to avoid foreclosure. (*See* doc. 1-3 at 16–17.) This claim does not implicate DHIM because it is entirely premised on JPMC's conduct. He also alleges that Defendants breached the "duty of good faith and fair dealing." (*Id.* at 17.) While this claim appears to be a separate cause of action, even if considered as a basis for his breach of contract claim, he fails to state a viable claim against DHIM. In Texas, unless expressly created by the parties' contract, the duty of good faith and fair dealing applies only if there is a 'special relationship' between them, such as between insurers and insureds, principal and agent, and business partners. *Franklin v. BAC Home Loans Servicing, LP*, No. 3:10-CV-1174-M, 2012 WL 2679496, at *6 (N.D. Tex. June 6, 2012), *recommendation adopted*, 2012 WL 2688809 (N.D. Tex. July 5, 2012) (citing *Hall v. Resolution Trust Corp.*, 958 F.2d 75, 79 (5th Cir. 1992)). The relationship between Plaintiff (the mortagor) and DHIM (the mortgagee) does not qualify as that type of relationship (*see id.*), and he does not identify any contractual provision expressly creating a duty of good faith and fair dealing between them.

*v. Wells Fargo Bank, N.A.*, No. 3:12-CV-0448-B, 2012 WL 2864499, at *3 (N.D. Tex. July 12, 2012); *see also Lamb v. Wells Fargo Bank*, NA, 3:12-CV-00680-L, 2012 WL 1888152, at *5 (N.D. Tex. May 24, 2012) (holding that MERS could assign the deed of trust because the deed of trust "on its face" granted MERS "the right to sell and foreclose the property" ). Moreover, because the note and deed of trust "must be read … and construed together… as a single instrument," courts have also held that the transfer of either the note or deed of trust automatically transfers the other. *See Warren v. Bank of Am., N.A.*, No. 3:11-CV-3603-M, 2012 WL 3020075, at *4 (N.D. Tex. June 19, 2012), *report and recommendation adopted*, 2012 WL 3024746 (N.D. Tex. July 24, 2012) (citation omitted); *Islamic Ass'n of DeSoto, Texas, Inc. v. Mortgage Elec. Registration Sys., Inc.*, No. 3:12-CV-0613-D, 2012 WL 2196040, at *3 (N.D. Tex. June 15, 2012) (Fitzwater, C.J.).

Here, the deed of trust identified MERS as its beneficiary and the nominee for Lender (DHIM). (docs. 1-3 at 4; 20-1 at 1.) As such, MERS could foreclose and sell the Property upon default, assign the deed of trust to a third party, and take any other action required of Lender. (*See* doc. 20-1 at 2.) For these reasons, MERS's assignment was valid and effectively transferred both the deed of trust and the note to JPMC. *See Willeford*, 2012 WL 2864499, at *3; *Warren*, 2012 WL 3020075, at *4. Accordingly, there is no reasonable basis for predicting that Plaintiff might recover against DHIM for breach of contract on this ground.

ii.     *Violations of § 51.002 of the Texas Property Code*

Plaintiff alleges that "Defendant[s] ... violated the Texas Property Code § 51.002 and breached the Deed of Trust" by not giving him the opportunity to cure the default, "reinstate his note," and "stop [the] foreclosure." (doc. 1-3 at 16.)

Section 51.002 of the Texas Property Code "requires two primary notices in the foreclosure

context: a notice of default, and a notice of sale." *Willeford*, 2012 WL 2864499, at *4.  Specifically,

§ 51.002(d) requires the lender to provide to the debtor notice of default and intent to accelerate, and

to give the debtor an opportunity to cure the default within a minimum of 20 days.  Tex. Prop. Code

Ann. § 51.002(d) (West 2012).  If the lender invokes the power of sale under the deed of trust, it

must provide to the debtor notice of the time and place of the foreclosure sale at least 21 days prior

to the date of the sale by posting notice in the county where the property is located, filing the notice

with the office of the county clerk, and "serving written notice of the sale by certified mail on each

debtor."  *Id.* § 51.002(b).

Plaintiff appears to argue that Defendants violated § 51.002(d) of the Texas Property Code

by failing to give him notice of default and opportunity to cure.  (*See* doc. 1-3 at 19–20.)  He does

not allege, however, that this statutory provision was expressly incorporated into the deed of trust

and was therefore made part of his contract with DHIM.  (*See* doc. 1-3.)  Accordingly, even if

Defendants failed to send him the requisite notices under Tex. Prop. Code § 51.002(d), there is no

reasonable basis for predicting that he might recover against DHIM for violation of this statute.

### iii.    *Violations of HUD Regulations*

Although the NHA and the corresponding HUD regulations do not provide mortgagors with

a private remedy, "a violation of HUD regulations may create a private cause of action if the

regulations are 'explicitly incorporated' into [an] agreement."  *Bassie v. Bank of Am., N.A.*, No.

4:12-CV-00891, 2012 WL 6530482, at *4 (S.D. Tex. Dec. 13, 2012) (citing *Baker v. Countrywide

Home Loans, Inc.*, No. CIV A 308-CV-0916-B, 2009 WL  1810336, at *5 (N.D. Tex. June 24,

2009)); *see also Smith*, 2013 WL 1165218, at *2 ("Federal statutes and regulations can form the

basis of a breach-of-contract claim if the parties expressly incorporate them into their contract.")

Here, pointing to section 6(B) of the note and sections 9(a) and 9(d) of the deed of trust, Plaintiff contends that certain "HUD regulations were [made] … part of [the] integrated contract" between him and DHIM.  (doc. 1-3 at 13–14.)  According to him, by "the express terms" of the contract, Defendants could not accelerate the note or foreclose on the Property unless specifically authorized by the HUD regulations.  (*Id.*)  He claims that Defendants violated the HUD regulations and breached the contract by foreclosing on the Property without: (1) conducting, or making a reasonable effort to arrange, a face-to-face meeting with him as required by 24 C.F.R. § 203.604(b); (2) informing him of other "available assistance" as required by 24 C.F.R. § 203.604(e)(2); or (3) conducting loss mitigation, such as accepting "partial payments" or holding them in trust "pending [the] disposition" of his account as required by 24 C.F.R. § 203.556(b).  (*Id.* at 15–16.)  Plaintiff also contends that the JPMC customer service specialists assigned to his account failed to properly assist him or even return his phone calls.  (*See* doc. 1-3 at 8–12.)  According to his allegations, no JPMC employee ever conducted or made a reasonable effort to arrange a face-to-face-meeting with him or with his relative.  (*See id.* at 5–13.)  After he made his three "trial payments," JPMC refused to accept additional payments from him.  (*Id.* at 5, 7, 9.)  Taken as true, these allegations raise a reasonable inference that Defendants breached the deed of trust by violating 24 C.F.R. §§ 203.604(b) and 203.556(b).

        c.     <u>Plaintiff's Performance</u>

Plaintiff alleges that after he received notice that his escrow account was under-funded, he immediately contacted JPMC in efforts to resolve the problem.  (doc. 1-3 at 4–5.)  Because he could not afford the payments that were allegedly required to cover the shortage, he applied for a loan

modification at the direction of a JPMC employee and submitted all of the requested documentation. (*Id.* at 5–13.)  He contends that he made three "trial payments" of $1,700.00 in early 2010 while JPMC reviewed his loan modification application.  (*Id.* at 5–7.)  He attempted to make a $5,000 payment to JPMC in July 2010.  (*Id.* at 7.)  In February 2012, Plaintiff's relative told a JPMC employee that he had the $21,000 that was needed to "stop the foreclosure," and they could verify it.  (*Id.* at 8.)  By August 2012, his relative told another JPMC employee that he had the $44,000 that was now required to "stop the foreclosure sale."  (*Id.* at 11.)  Taken as true, these allegations raise a reasonable inference that he performed or attempted to perform under the contract.

          d.     <u>Plaintiff's Damages</u>

Plaintiff contends that during the two and a half years that JPMC delayed in reviewing his modification application, JPMC  "added" to his account "numerous charges for late fees," "past due interest," and other "wrongful" charges.  (*Id.* at 13.)  These allegations raise a reasonable inference that Plaintiff suffered damages as a result of Defendants' purported breach of contract.

In conclusion, Plaintiff has pled enough facts to state a plausible breach of contract claim against DHIM based on Defendants' alleged breach of the deed of trust and violations of 24 C.F.R.§§ 203.604(b) and 203.556(b).  Accordingly, there is a reasonable basis for predicting that he might be able to recover against DHIM for breach of contract.

        ***3.***     ***Anticipatory Breach of Contract***

Plaintiff also lists a claim for "anticipatory breach of contract."  (doc. 1-3 at 13.)

The elements of an anticipatory breach of contract action in Texas are "(1) an absolute repudiation of the obligation; (2) a lack of just excuse for the repudiation; and (3) damage to the nonrepudiating party."  *Swim v. Bank of America, N.A.*, No. 3:11–CV–1240–M, 2012 WL 170758,

at *4 (N.D. Tex. Jan. 20, 2012) (citing *Gonzalez v. Denning*, 394 F.3d 388, 394 (5th Cir. 2004)).

"The party's intent to abandon a contractual obligation may be based on either words or actions, but

such declaration must be expressed in positive and unconditional terms." *Wiley v. U.S. Bank, N.A.*,

No. 3:11-CV-1241-B, 2012 WL 1945614, at *3 (N.D. Tex. May 30, 2012) (citation omitted).  To

the extent that Plaintiff is asserting an anticipatory breach of contract claim separate and apart from

his breach of contract claim, he fails to allege any facts showing that DHIM positively and

unconditionally demonstrated, through either words or actions, an intent to abandon its obligations

under the deed of trust.  (*See* doc. 1-3 at 13–20.)  Accordingly, there is no reasonable basis for

predicting that he might recover against DHIM under this claim.

## C.   **Amount-in-Controversy**

Plaintiff does not address the amount-in-controversy requirement of diversity jurisdiction.

JPMC contends that by seeking "to rescind [the] foreclosure sale" and recover ownership of the

Property, Plaintiff has placed the title to the Property in dispute, and the Property's value is therefore

the proper measure of the amount in controversy.  (doc. 1 at 4.)  It argues that this amount exceeds

$75,000.00 because the Property's current appraised value is $146,320.00.  (*Id.*)

The amount-in-controversy threshold is a necessary element that must be met before a

federal court properly exercises diversity jurisdiction. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514

(2006).  In motions to remand, the amount in controversy is determined from the plaintiff's

perspective. *Burr v. JP Morgan Chase Bank, N.A.*, No. 4:11-CV-03519, 2012 WL 1016121, at *2

(S.D. Tex. Mar. 23, 2012).  The defendant, as the removing party, bears the burden of establishing

by a preponderance of the evidence that the amount in controversy exceeds $75,000.00. *De Aguilar*

*v. Boeing Co.*, 11 F.3d 55, 58 (5th Cir. 1993).  The defendant may satisfy this burden by

demonstrating that it is facially apparent from the plaintiff's petition that the claim likely exceeds $75,000.00, or by setting forth the facts in controversy that support a finding of the requisite amount. *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1335 (5th Cir. 1995).

### 1.      *The Object of the Litigation*

In actions where the plaintiff seeks injunctive relief, "it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977). The "object of the litigation" is "the value of the right to be protected or the extent of the injury to be prevented." *McDonald v. Deutsche Bank Nat. Trust Co.*, No. 3:11-CV-2691-B, 2011 WL 6396628, at *2 (N.D. Tex. Dec. 20, 2011) (citing *Hartford Ins. Group v. Lou-Con Inc.*, 293 F.3d 908, 910 (5th Cir. 2002)). If the injury sought to be prevented is the loss of title to property, then the property itself becomes the object of the litigation. *Burr*, 2012 WL 1016121, at *3. Accordingly, where the plaintiff puts the title to property in dispute, the value of the property is the proper measure of the amount in controversy. *Id.*; *accord McDonald*, 2011 WL 6396628, at *2 ("When 'a right to property is called into question in its entirety, the value of the property controls the amount in controversy.'") (citing *Waller v. Prof'l Ins. Corp.*, 296 F.2d 545, 547–48 (5th Cir. 1961)).

While Plaintiff does not place a dollar amount on the recovery he seeks, his complaint makes several allegations that put the title to the Property in dispute. He seeks a declaration that Defendants waived their right to foreclose on the Property. (doc. 1-3 at 20, 26.) He argues that JPMC "obtained no title" to the Property, and its claim to title is "improper," because the foreclosure sale was "void." (*Id.* at 27.) He lists the "loss of title to [the Property]" as part of his "damages." (*Id.* at 28.) Lastly, he requests injunctive relief to set aside the foreclosure and prevent his eviction,

alleging that those actions would deprive him of his "right to sell or mortgage the Property at some future date." (*Id.* at 29.) With these allegations, Plaintiff calls into question the right to the Property in its entirety and makes it the object of the litigation. The value of the Property is therefore the proper measure of the amount in controversy. *See Merryman*, 2012 WL 5409735, at *7.

### 2.    *The Property's Value*

To support its contention that the Property is worth more than $75,000.00, JPMC asserts that the Property "has a current fair market value of $146,320.00" according to the Hunt County Appraisal District (CAD). (doc. 1 at 4.) Plaintiff does not dispute or even address JPMC's contentions regarding the Property's value. The Hunt CAD website shows the Property was appraised at $146,320.00 in 2012. *See* http://esearch.hunt-cad.org/Property/View/212689 (last visited April 23, 2013). The Court may take judicial notice of this valuation by the Hunt CAD because it is information that is generally known and is not subject to reasonable dispute. *See* Fed. R. Evid. 201(a) (a court has authority to take judicial notice of adjudicative facts); *CleanCOALition v. TXU Power*, 536 F.3d 469, 471 n.2 (5th Cir. 2008) (an adjudicative fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned") (citing Fed. R. Evid. 201(b)). JPMC has shown, by a preponderance of the evidence, that the Property is worth more than $75,000.00.

Although the amount-in-controversy requirement is met, JPMC has failed to meet its heavy burden to show that DHIM was improperly joined. DHIM's presumed Texas citizenship therefore defeats the complete diversity requirement of diversity jurisdiction. Because JPMC has not provided a basis for exercising subject-matter jurisdiction over this action, remand is required.

## V.  RECOMMENDATION

Plaintiff's motion to remand should be **GRANTED**, and the case should be remanded to the 196th Judicial District Court of Hunt County.  DHIM's motion to dismiss should be **DENIED as moot.**

**SO RECOMMENDED** on this 17th day of May, 2013.


_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n,* 79 F.3d 1415, 1417 (5th Cir. 1996).


_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE